1835.

HARRISON
*v.*
WILLIAMSON

---

HARRISON and another *v.* WILLIAMSON and others.

---

G. applied to H. and S. in Baltimore to sell him 74 hhds. of molasses on a credit of four months. They declined d..ing so upon his own credit. He offered to give them a draft upon Mess. H. of N. Y., his consignees. They agreed. G. left Baltimore and went into Virginia. H. and S. wrote to G. saying they were ready to deliver the molasses and considered it at his risk and account. They then commenced shipping it to N Y. .(consigned to Mess. H.) and handed over the bills of lading to G.'s agents. Another letter showed they were using all their exertions to ship off the whole; and they forwarded a draft in blank, on Mess. H., requesting G. to sign and ieturn it. They afterwards wrote for the draft and notified G. of the clearance of all the hogsheads. Not hearing from him, they again wrote for the draft. It appeared he had become ill in Virginia; and a friend, at whose house he was, answered their letter at G.'s request, stating that G. would soon go on to Baltimore and then give the draft. They again wrote, urging to have the diaft, saying it was all they at present required. G died insolvent and without having signed the drnft. The consignees, Mess. H., who had got the merchandize insured, were applied to by H. and S., the latter sending a bill of parcels, referring to G.'s death and asking Mess. H. to honor the amount at the credit of the four months. A creditor in N. Y. had taken out administration upon G.'s effects, and claimed the proceeds arising from the molasses. *Held* that there had been an absolute sale. And the bill of H. and S., which had been filed to repudiate a sale and to have restoration of the molasses or the proceeds thereof, was dismissed with costs.

A general bill of exchange has not the effect of an assignment of the money (for which it is drawn) in the hands of the drawee.

Feb. 10, 11,
1835.

*Vendor and
Vendee.
Sale or
Conditional
Sale ?
Bill of
exchange.*

---

This case involved the question of a conditional sale and delivery of merchandize; and how far the vendor was at

liberty to reclaim the goods after he had parted with the possession, where the contract was not complied with by the vendee?

Sometime in the month of October, one thousand eight hundred and thirty-one, William C. Garrison applied to the complainants, Harrison and Sterritt, merchants of Baltimore, and proposed to buy from them seventy-four hogsheads of molasses, at a certain price, and upon a credit of four months. The complainants were unwilling to make the sale at that length of credit upon Garrison's sole responsibility. Whereupon he offered to give them his draft for the amount at four months on Mess. E. and J. Herrick of New York, to whom he intended to send the property for sale as his factors.

They still declined to make the bargain absolutely binding, until they could obtain information as to the standing of the house of E. and J. Herrick, and could satisfy themselves that their acceptance would be good security. Having, in the course of a few days, satisfied their minds on the subject, they concluded to sell the molasses on the terms proposed. In the meantime, Garrison had left Baltimore and gone into Virginia.

On the seventh day of November, one thousand eight hundred and thirty-one, the complainants addressed a letter to him, saying: " We are ready to deliver the molasses you purchased from us on the 21st ultimo and consider it at your risk and account."

After this, the complainants commenced shipping the molasses ; and, by different vessels, shipped the whole for New York, consigned to Mess. E. and J. Herrick, by or before the fourteenth day of December, one thousand eight hundred and thirty-one—and handed over the bills of lading to the agent of Garrison at Baltimore to be forwarded. On the first day of the same December, the complainants enclosed to Garrison a bill of parcels of the molasses and a draft, in blank, on E. and J. Herrick, with a request that he would sign and return it to them ; and in their letter they say, " we have used every exertion to obtain a conveyance to New York, and have yet forwarded but 10 hogsheads. Thirty more are engaged to go on deck, but the packet has

been aground for several days past, and cannot stir. We have the promise of the next vessel, and shall have it off with every despatch in our power."

On the fourteenth day of December, they wrote again to Garrison, saying : " we addressed you on the 1st instant, to which we have not a reply, although the letter contained a draft for your signature on Mess. E. and J. Herrick for the amount of the molasses purchased from us ; and in conformity to the bargain, you will much oblige us by attending to the subject, and transmitting us your draft for the amount. We have to advise the clearance of all the molasses for New York, bills of lading for which have been handed over to your friends, Mess. Crawfords."

On the twenty-third day of December, the complainants write to him again, referring to the letter of the first and fourteenth, to which they had had no reply, annexing a second bill of parcels, and repeating the request for the draft by a return of mail. At this time the complainants had heard Garrison was ill at Richmond ; and they, therefore, enclosed the letter to a Mr. Morris, to be handed to him. Having received a letter from Mr. Morris, at whose house Garrison was lying sick, which stated Garrison had requested him to say that, in consequence of indisposition, he had not been able to attend to his own affairs, but as soon as he could travel with safety he would go to Baltimore, when he would give the draft required, the complainants, on the twenty-ninth of December, again wrote to Morris, saying they had certainly expected Garrison's answer before that time and were disappointed—begging Morris to communicate to him their request that he would sign the draft forwarded for his signature, and transmit it to them—observing "it is all we require at present, and we cannot conceive the necessity of his waiting until his arrival here. We trust he will not delay this reasonable request."

Garrison died about the same time ; and without signing the draft.

The property having been shipped, as before mentioned, to the Mess. Herrick, the complainants, on learning the death of Garrison, apprised them, by a letter of the fourth of January, one thousand eight hundred and thirty-two, of

the fact of his death; and in which they said, that not apprehending such an event, " we obeyed his order in shipping the molasses he purchased from us, and handed over the bills of lading to his friends H. and W. Crawford, to be forwarded to you. The insurance being made by you, as we understand, this course of proceeding rendered it unnecessary for us to correspond with you; but as Mr. Garrison repeatedly assured us that, on his arrival here, he would give us a bill for the amount on you and as this is prevented by his death, we take the liberty of handing you a bill of parcels for the whole he purchased, amounting to $2327,68, for which we hope you will feel yourselves authorised and at liberty to settle with us at the maturity of the credit. If agreeable, we will thank you to allow us to draw upon you for the amount according to contract."

On the fourth day of February, one thousand eight hundred and thirty-two, the complainants again wrote to Mess. E. and J. Herrick, urging their claim to be paid by the latter out of the property or the proceeds, upon the principle of carrying Garrison's agreement with them into effect. About this time, however, the defendant, Richard Williamson, had procured letters of administration, from the surrogate of New York, upon the estate of Garrison; and, as such administrator, claimed to be entitled to the goods or the proceeds in the hands of the Mess. Herrick. They could not, therefore, with safety accede to the wishes of the complainants.

Garrison died insolvent. His estate proved insufficient to pay his debts; and hence the complainants had filed their bill, repudiating the sale and praying the possession of the property or to receive the proceeds. On the other hand, the administrator insisted that the title to the property effectually passed and became vested in Garrison, and that the proceeds were assets to be applied in a due course of administration.

The Mess. Herricks had no other interest than as stakeholders; and they deposited the money in court.

1834.

HARRISON
v.
WILLIAMSON

*Mr. J. L. Mason,* for the complainants.

*Mr. Gerard,* for the defendant Williamson.

*July* 20.      THE VICE-CHANCELLOR :—The bill places the right of the complainants to relief, upon the ground that the sale and delivery of the molasses were conditional and passed no title to the purchaser until he performed the condition of giving the draft on the Mess. Herrick for the amount ; and, as such draft has not been given, that they are at liberty to disavow the contract of sale and look to the Herricks as their agents or trustees.

If, as between the complainants and Garrison, such would be the case, of course the complainants have the same right as against the administrator who had acquired no better title than Garrison had at his death.

The object of the complainants in requiring a draft upon the consignees and factors of the purchaser, as one of the terms or conditions of the sale, undoubtedly was to have security for the amount of the purchase : and yet it is a little remarkable that, while they were making enquiries as to the standing of the house of E. and J. Herrick, they took no measures to ascertain whether such a draft would be accepted—nor did they ask Garrison to furnish them with any evidence of his authority to draw a bill which would bind the drawees to accept. It appears, therefore, to have been taken for granted that such a draft would be honored, from the mere fact of the property having been sent to the intended drawees for sale. These circumstances serve to show, what I think is very apparent from the letters written by the complainants, that they did not expect the draft to be delivered to them previous to their parting with the possession of the property or intend the sale to be conditional and to pass no title, until the draft was actually drawn and placed in their hands. Thus, in the letter of the seventh of November, they give Garrison notice of the bargain being consummated and of their readiness to deliver ; and state that the property is from thenceforth at their risk. Here there is no reservation of the benefit of a condition or claim of right to

retain the property until the terms of sale are complied with by the vendee—they are ready to deliver and make no demand of the draft as a condition precedent to such delivery. Nay more : they give him to understand expressly that the property is from thenceforth at his risk and held on his account. How could this unqualified declaration be made unless they considered the title changed and the right of property completely vested in the purchaser? Upon no other ground, it appears to me, could they make the declaration.

The complainants then go on and deliver the property; they ship it according to the orders and the intentions of the purchaser ; and they hand over the bills of lading to his agents to be forwarded to his consignees and whereby the latter are enabled to effect insurance upon it as the buyer's property. In all this time there is no mention made or pretence set up of its being a conditional sale or a conditional delivery. Nor, in the letters of the first and fourteenth of December, wherein they call the purchaser's attention to the giving of the draft, do they pretend they were to have had the draft before the molasses was shipped or the possession parted with ; and, although in the last of these two letters and in the subsequent one of the twenty-third of December they are particularly urgent for the draft to be signed and transmitted to them, there is not a syllable on the subject of its being a conditional delivery of the property or that they had so considered or should so consider it until furnished with the draft according to the contract. And that such was not the understanding of the contract by either of the parties at the time is, I consider, still further manifested by the subsequent letters written by these complainants. They had heard of Garrison's sickness ; he had informed them, through Mr. Morris, that as soon as he was able to travel he would return to Baltimore and give it ; and to this they reply complaining of the delay and expressing their disappointment: and yet all they do is to repeat their former request that he would sign the draft and transmit it to them—which was all they then required of him. Now, if by the terms and conditions of the contract or by any circumstance attending the shipment and delivery of the property they had the least idea of the title not having effectually and entirely passed or that they still

had a right to reclaim it, according to their own understanding of the transaction, it appears to me that, instead of all their persuasion, they would, at once, have said "in withholding from us the draft there is a breach of the condition upon which the property was sold and delivered and unless we receive the draft by return of mail we shall consider the property as belonging to us, although it may have reached its destination and we wish you likewise so to consider it." Nothing, however, of this kind is intimated. Indeed, in the letters written to E. and J. Herrick, after the intelligence of Garrison's death, the complainants do not attempt to disavow the contract or reclaim the property or its proceeds on the ground of any condition unperformed. They rather seek the performance, by asking the Mess. Herrick to accept their draft instead of the one which Garrison was to have drawn or pay over to them the amount at the expiration of the four months credit.

Upon the whole, it seems to me impossible to regard this transaction in the light of a conditional sale and delivery with any right to reclaim the identical goods or proceeds in the hands of the purchaser or volunteers under him, on account of his not having given the draft or bill in payment according to his stipulation.

The true exposition which the complainants, by their own acts, in my opinion, have given of the contract is, that the draft was to serve as a mode of payment and security for the price of the property sold, which they were to be furnished with by the vendee, but that the giving of it was not made a condition of the contract so that the non-performance was to avoid the sale and re-invest the vendors with the right of property in the goods—that the sale became absolute on the seventh day of November—and I have no doubt the understanding of both parties was that the molasses were to be shipped to New-York as fast as possible and thus the delivery be effected. As the vendee had left Baltimore before the vendors had obtained the information which they desired, to enable them to consummate the bargain, it was not expected the vendee could draw his bill for the amount until he should return to Baltimore. In the interim, they were to go on and deliver the property in the manner

1835.

HARRISON
v.
WILLIAMSON

stated. Sickness unexpectedly intervened to prevent his return and it occasioned delay. Hence, the letters were written to him, to sign and transmit the draft to the vendors, and which would have been a fulfilment of the contract. They would then have forwarded it to New-York for acceptance. If accepted, the vendors would have had the security they desired for the payment of the goods at the expiration of the four months; and if it had then been dishonored, they would have been entitled to a right of action at once against the drawer. So, if he had refused to give the draft in payment, an action would have lain at law for such refusal and therein they could have recovered; the measure of damages, being the amount for which the draft was to have been given. Hence, the benefit of the stipulation that the vendees hould give his draft on his factors; without the precaution, on the part of the vendors, of ascertaining positively it would be accepted. All this is perfectly consistent with other parts of the transaction; and it is this which the parties may be supposed to have had in view.

There is no necessity, then, for considering it a matter of condition in the sale; and the circumstances are opposed to the adoption of such a construction.

Viewing it, as I am constrained to do, in the light of an absolute and unconditional sale and delivery of the property, and there is no principle or rule of law or equity which would authorize this court to interfere. The title effectually passed and vested in the purchaser; the vendor has no lien for the purchase money; and, although it may be a case of great hardship, a Court of Equity cannot relieve. In my view of the case, there is no room for the application of the principles which secure to vendors the right to reclaim the property or its proceeds even as against the vendee. Those principles, as deduced from previously adjudged cases which it is unnecessary now more particularly to advert to, are collected and arranged in 2 Kent's Com. 391; also in the opinion of Justice Washington in *Copland* v. *Bosquet*, 4 Wash. C. C. R. 588.; and I would also refer to the more recent decisions of our own courts, as establishing more firmly than ever the law upon the subject, in

HARRISON
v.
WILLIAMSON

*Lupin* v. *Marie*, 6 Wend. R. 77, and *Furniss* v. *Hone*, 8 Ib. 247—see also, *Buck* v. *Grimshaw*, 1 Edwards, C. R. 141.

Another point has been made on the part of the complainants : that, although the delivery be deemed absolute, yet the funds which were in the hands of the Mess. Herrick, to the amount of the price of the goods, were equitably assigned by Garrison's undertaking to give the draft. This has proceeded partly upon the notion of compelling a specific performance of the contract; and the cases of *Withy* v. *Cottle*, 1 Sim. & S. 174 ; *Lingen* v. *Simpson*, Ib. 600 ; *Adderly* v. *Dixon*, Ib. 607 have been cited. These cases, however, do not apply. Whenever a court of chancery has interfered to decree a specific performance of a contract in relation to personal property, it has been upon grounds and for reasons which do not exist in the present case. Nor is there any thing in the idea of an equitable assignment of the proceeds of the molasses upon Garrison's undertaking to give the draft. A bill of exchange has not the effect of an assignment of the money (for which it is drawn) in the hands of the drawee, unless, perhaps, where it is drawn upon a particular fund and then, indeed, by the law merchant, it loses its character as a bill of exchange : Chitty on Bills, 55.

There is no foundation upon which to rest the claim set up in the present case ; and I must, consequently, dismiss the bill, with costs.