Burch *v.* Newberry.

---

---

ONEIDA SPECIAL TERM, December, 1847.   *Gridley*, Justice.

## BURCH *vs.* NEWBERRY & BURCH.

On the 30th of April, 1845, upon the termination of a copartnership between W. L. N. & I. H. B., under the firm of N. & B., a new copartnership was formed between I. H. B. and T. B. the plaintiff, as their successors in business, under the name of I. H. B. & Co., to commence on the 1st of May. Previous to the time when the new partnership commenced, I. H. B. paid and took up outstanding notes of the old firm to the amount of $10,000, and received in payment for that advance the draft of N. & B. upon J. T. S. & Co., for $3000, and their order upon J. T. S. & Co., dated May 1, 1845, requesting them to deliver to I. H. B. & Co., or order, certain specified drafts, or their avails, to the amount of $6228,88, which J. T. S. & Co. had previously received from N. & B., for collection ; the new firm giving their note to N. & B., for $940,93, the difference between the $10,000 paid by them and the amount of N. & B.'s draft and order. The order was, on the day of its date, endorsed and sent by I. H. B. & Co., to J. T. S. & Co., by mail, in a letter requesting the latter to acknowledge the receipt of the drafts called for by the order, and hold them for collection on account of I. H. B. & Co., and to sell two of such drafts, and credit the proceeds. On the 9th of May the drawees of the order wrote to the drawers, merely acknowledging the receipt of such letter and order from them, and promising to refer to such order in their next letter. On the 16th of May J. T. S. & Co. failed; without having complied with the requirements of the order; and having, in fact, parted with the drafts therein mentioned, and used and converted the proceeds of the sale for the purposes of their business, generally, previous to the date of the order, by virtue of a general authority as the agents of N. & B., to sell any paper of theirs whenever their account required it. Up to the time of their failure J. T. S. & Co. maintained a good credit and paid all legal demands when presented.

On a bill filed by T. B. against I. H. B. & W. L. N., claiming that by reason of the failure of the drawees to meet the order, I. H. B. & Co., the holders, became entitled to receive from N. & B. as the drawers, in proportion to their shares and interest, the amount which they had paid for the order on J. T. S. & Co., and praying that W. L. N. might be decreed to refund and pay over to I. H. B. & Co. the moiety of such amount for which he was liable:

Burch *v.* Newberry.

*Held,* 1. That the transaction between I. H. B. and the old firm of N. & B. was to be regarded as an adjustment and settlement, *pro tanto*, of the copartnership business of that firm, and as a *purchase* by, and a transfer to, I. H. B., one of the copartners, of all the effects of the firm then remaining in the hands of J. T. S. & Co.

2. That at the time of the assignment of the drafts, or their avails, by N. & B., a fund representing such drafts was in the hands of J. T. S. & Co. subject to be transferred by any lawful contract or assignment executed by N. & B.

3. That T. B., the plaintiff, deriving his title to relief under the order of N. & B. upon J. T. S. & Co., he became jointly interested with I. H. B. in the fruits of his purchase of the partnership funds, and merely succeeded to an undivided moiety of his interest therein.

4. That the agreement was a fair one, without fraud or warranty, and was binding upon both parties; that the new firm were the absolute owners of the entire beneficial interest in the fund; and that the loss thereof, by the failure of the drawers sixteen days after the date of the order, fell upon them, and furnished no ground for relief to the plaintiff, against W. L. N.

5. That the order upon J. T. S. & Co. was not a bill of exchange, or an order drawn on a particular fund, but was an assignment of the fund to the holders, and transferred the property therein to them; especially after the presentment of the order.

6. That the conduct of J. T. S. & Co., instead of being a refusal to comply with the order, was to be regarded as an acquiescence in its directions, with a postponement of an immediate compliance therewith.

7. That J. T. S. & Co. being requested to deliver and receive the fund, themselves, for the new firm, were to be presumed to have performed that duty; inasmuch as they had the money in their possession. That upon the receipt of the order, and of the letter of I. H. B. & Co. they were thenceforward the holders of the fund as the agents of that firm; and the omission to place it formally to the credit of I. H. B. & Co., or to acknowledge the holding of it for them, was the neglect of an act to be done as the agent of that firm solely. And that by the omission of that act N. & B. ought not to be prejudiced.

8. That the payees of the order were bound to use reasonable diligence in presenting the same to the drawees, and demanding payment. That a demand of payment made by J. T. S. & Co. of themselves, was no such demand as the law contemplates when it holds the party to the use of a reasonable diligence; but that a demand should have been made by some third person authorized to receive the actual possession of the fund.

It is a general maxim of the court of chancery that equity regards whatever is ordered to be done by one having authority—as by a testator in his will—or, what ought to be done, as actually done.

IN EQUITY. In April, 1845, the plaintiff Thomas Burch and the defendant Isaac H. Burch entered into an agreement, at Little Falls, to form a copartnership for carrying on the busi-

ness of exchange brokers at Chicago, Illinois, under the name of I. H. Burch & Co., to commence on the 1st of May thereafter. I. H. Burch was to reside at Chicago, and take charge of the business, and the plaintiff resided at Little Falls. The plaintiff and I. H. Burch provided the funds, and prepared to enter on the business. I. H. Burch and W. L. Newberry, also a resident of Chicago, had for more than a year previous to such agreement, been engaged as copartners in the business of exchange brokers at Chicago, under the name of Newberry & Burch. And by a mutual understanding, it was agreed between them that their partnership should be dissolved, and their business closed. Pursuant to this understanding, and in order to effect the dissolution, I. H. Burch received funds on the joint credit of the plaintiff and himself, and with such funds took up the notes of Newberry & Burch to the amount of $10,000 besides some interest, then outstanding; which notes I. H. Burch took with him, on his return to Chicago; when the dissolution of the firm of Newberry & Burch was agreed to take effect on the 1st of May, 1845. On the 30th of April, 1845, Newberry & Burch made their draft on the house of John T. Smith & Co., New-York, for $3000, payable at sight, to the order of I. H. Burch & Co., to apply on, and towards, the notes of $10,000 of Newberry & Burch so paid and taken by I. H. Burch as above stated. To make up the balance of the $10,000, Newberry & Burch, on the same day, made their order in writing addressed to J. T. Smith & Co., in the words and figures following:

"Chicago, April 30, 1845.

Please deliver to I. H. Burch & Co. or order described drafts, or their avails, which you have received from us for collection.

| | |
|---|---|
| H. C. Stone on J. Nevins & Sons. Dated June 11, | |
| due June 3 - - - -, | $1100 |
| Do. same, Feb. 8, May 23 - - - | 1100 |
| Do. " " 20, May 24 - - - | 1100 |
| J. Corning & Co. Corning & Co. March 11–14 | 928,88 |

Burch *v.* Newberry.

O. Lunt on Bigelow & Gibson, Boston, Nov. 26,
    6 m. 29   -   -   -   -   -   -   1000
T. H. Gibson, New-York, Dec. 13, 6 m. June 6,  1000

$6228,88

And oblige                NEWBERRY & BURCH."

This order was, on the same day, endorsed by I. H. Burch and sent by mail in the name of I. H. Burch & Co., to John T. Smith & Co., New-York, in a letter containing other matters, and referring to the order as follows : " Also Newberry & Burch order on you for sundry collection or its avails, amounting to $6228,88. The two drafts on Nevins & Sons of $1100 each, due June 3 and May 23, please sell at once and credit proceeds. Please acknowledge to us the receipt of the paper called for by the above order, specifying the items and time of maturity, and hold them for collection on our account." The drafts specified in this order were mutually charged and credited in the books of Newberry & Burch and of I. H. Burch & Co. to each other ; and the difference between their amount together with the $3000 draft, and the $10,000 paid by I. H. Burch & Co. upon the two notes of Newberry & Burch, was made up by the note of I. H. Burch & Co. At the time the order for the drafts was given it was understood and agreed between Newberry and I. H. Burch, that Newberry & Burch should be holden liable to I. H. Burch & Co. as endorsers on all of the drafts, except those on Nevins & Sons. On the 9th of May, 1845, John T. Smith & Co. immediately after the receipt of the order of Newberry & Burch, by their letter of that date, acknowledged the receipt of the letter of I. H. Burch & Co. of May 1st, and of the enclosed draft for $3000, stating it was placed to the credit of I. H. Burch & Co. ; and in reference to the order for the several drafts, they said, " We have no time to-day to examine N. & B.'s order for the paper. Will refer to it in our next." But no other reference to those drafts, nor any acknowledgment or communication respecting them was ever made, until after the failure of John T. Smith & Co. on the 16th of May.

John T. Smith & Co. not having complied with the requirements of the order to deliver to I. H. Burch & Co. the drafts, or the avails thereof, excepting the draft of Lunt for $1000, and having stopped payment, the bill in this cause was filed by Thomas Burch against Newberry and I. H. Burch, claiming that by reason of the failure of the drawees to meet the said order, I. H. Burch & Co., the holders, became entitled to demand and have of and from the late firm of Newberry & Burch as the drawers, in proportion to their shares and interest, the amount paid or accounted for by them to such late firm for the order for the drafts, less the amount of the draft of Lunt, which had been handed over to the plaintiff. And the bill prayed that Newberry might be decreed to refund and pay over to the firm of I. H. Burch & Co. the moiety of such amount for which he was liable; and for general relief.

The bill stated, that at the time the order for the drafts was given, Newberry and I. H. Burch fully believed that the drafts were in the hands of J. T. Smith & Co., duly accepted and waiting maturity, and they had entire confidence and belief in the solvency and integrity of J. T. Smith & Co. The answer of Newberry denied that either he or I. H. Burch believed, at that time, that the drafts were in the hands of John T. Smith & Co., duly accepted and waiting maturity. But it stated that, on the contrary, the words " or their avails" were inserted in the order at the suggestion of I. H. Burch, expressly to meet the contingency that the drafts, or some of them, had been sold by John T. Smith & Co. And the answer denied that it was understood, or agreed, that the firm of Newberry & Burch *guarantied* the responsibility of J. T. Smith & Co., or the delivery of the drafts mentioned in the order, or their avails; although it admitted that all parties believed J. T. Smith & Co. to be solvent, and had confidence in their integrity. The bill stated that there was at all times after the transmission of the drafts specified in the order, funds and money of Newberry & Burch in the hands of J. T. Smith & Co., more than sufficient to meet all the drafts drawn by Newberry & Burch on them, without recourse to any collection paper in their hands;

that before the time when the order was made by Newberry & Burch, J. T. Smith & Co. had in fact sold and disposed of the drafts, (excepting the draft of O. Lunt for $1000,) and had used and converted the proceeds of such sales to the purposes of their business, without reference to the accounts of Newberry & Burch, and had in no manner given credit to N. & B. on their books for the proceeds of such sales, nor in any manner applied them for the benefit of N. & B.; and that neither at the time the order for the drafts was made, nor at any time afterwards, were the drafts, or any of them, (except the draft of Lunt,) subject to the order of N. & B., or in any manner under their control. That J. T. Smith & Co. failed, and stopped payment on the 16th of May, 1845; and that they were in fact insolvent at the time the order was given, and for several months before their public bankruptcy. That I. H. B. & Co. used all reasonable diligence in transmitting and presenting the order, &c. The defendant Newberry insisted, in his answer, that the drafts mentioned in the order, and the avails thereof, were delivered to I. H. Burch & Co. when the order was received by John T. Smith & Co.; and that from that time John T. Smith & Co. held and possessed the drafts, or their avails, as the agents of I. H. Burch & Co., and with their knowledge and consent, and pursuant to their instructions.

The cause was heard on pleadings and proofs.

*A. Loomis & H. Denio,* for the plaintiff.

*J. A. Spencer & F. Kernan,* for the defendant Newberry.

GRIDLEY, J. I am satisfied, by the evidence in this case, that the transaction of the 30th of April, 1845, should be regarded as an adjustment and settlement, *pro tanto,* of the copartnership business of the firm of Newberry & Burch. The copartnership existing between the parties expired on that day; and the transaction in question embraced a purchase by, and a transfer to, I. H. Burch, one of the copartners, of all the effects of the firm then remaining in the hands of John T. Smith &

Co., of New-York. These assets amounted to the sum of $10,961,48; and the firm received in satisfaction therefor, a claim against itself amounting to $10,020,55, arising out of the payment by Burch of two $5000 notes of the firm, with the accruing interest; and for the residue, a note payable on demand, signed in the name of I. H. Burch & Co. for $940, 93.

I am led to take this view of the case, by the intrinsic probabilities arising out of the relative situation of the parties; as well as from the responsive allegations of the answer, and the documentary proofs in the cause.

1st. Nothing is more probable than this hypothesis, when we look at the facts disclosed by the evidence. Walter L. Newberry and Isaac H. Burch, constituting the firm of Newberry & Burch, were exchange brokers, residing and doing business at Chicago. To procure funds to enable them to carry on this business, they had borrowed the sum of $5000 of the Albany City Bank, upon a note dated on the 1st day of July, 1845, bearing two and a half per cent interest, upon certain conditions as to the circulation of the notes of the bank; and other $5000 of the Herkimer County Bank, upon a similar note, bearing interest at three per cent. The notes were signed in the firm name, "*Newberry & Burch*," and by "*T. Burch & Co.*," *surety ;* and were outstanding against the firm on the 1st of April, 1845. A large part of the business of Newberry & Burch consisted in selling drafts, payable at sight, on New-York; and to enable them to conduct this branch of their business, they made an arrangement with the house of J. T. Smith & Co., brokers, in the city of New-York, to accept and pay such drafts. It was a part of the arrangement that this house should be kept in funds for that purpose, by available paper which they were authorized to *collect*, and also to *sell*, and thus realize the proceeds upon it to meet the drafts that were liable to be presented, at all times, from Newberry & Burch.

In the course of the winter of 1845, Newberry had signified to his partner his intention to go out of the business, and to close the concern, so far as he was connected with it, in the

succeeding spring. Burch being desirous of continuing the business at Chicago, came to the state of New-York previous to the first of April, in that year, and entered into an arrangement with his brother, the plaintiff in this cause, to form a copartnership with him, for the purpose of continuing the business at the same place, upon the dissolution and close of the existing copartnership with Newberry. Preparatory, therefore, to the closing up of the old firm, and doubtless also with a view to the formation of this anticipated connection with the plaintiff, he paid and took up the two notes above mentioned, on or about the first of April, by substituting similar notes made by himself individually, as *principal*, secured, as the former notes had been, by the signature of the firm, "T. Burch & Co., *surety*." After I. H. Burch had thus paid and taken up these notes, and on the 5th of April, he and the plaintiff executed articles of copartnership for the commencement of the business of exchange brokers in Chicago, by which the said I. H. Burch was to reside at Chicago, and conduct the business there, at a fixed salary, and by which the plaintiff was to become equally liable for the payment of the two substituted notes; and by which it was also provided that the said "*agreement should take effect on the first day of May*, 1845." After the execution of this agreement, I. H. Burch returned to Chicago. On the 30th of April the old firm was dissolved; and on the first of May the new firm went into operation, and has since continued to prosecute its business at the same place. On that day the two notes which had been taken up by, and which had been receipted to, I. H. Burch individually, by the bank officers, were delivered to Newberry by him; each being receipted as follows: "*Received from Newberry & Burch, five thousand dollars in full payment of their note. The amount of thirty-seven $\frac{33}{100}$ dollars paid the —— Bank for interest due to 1st April*, was paid with Newberry & Burch's funds. I. H. Burch." Here, then, was one partner who had paid liabilities of the firm to the amount of $10,000, for which he was to be reimbursed by the firm at the close of their copartnership, which he here acknowledges himself to have received. If we ask, in what

manner was he paid? The answer is obvious. He received his pay by way of a transfer of the effects of the firm then in the hands of J. T. Smith & Co., in New-York ; and there being an excess of $940,93 of the funds transferred, above the debts of the firm which I. H. B. had paid, the latter gave a note for that amount, payable on demand. This transfer was made available to Burch by a draft of N. & B. on Smith & Co. for $3000 cash, and an order for the delivery of certain drafts called collection paper, specified therein, or the avails of such drafts, amounting to $6228,88. Now this draft and order were made payable to *I. H. Burch & Co.*, (the name of the new firm,) and the note given for the balance of $940,93 was also signed in the name of the new firm ; and hence it is argued that this was in part a transaction between Newberry & Burch on the one side, and I. H. Burch & Co. on the other. This, however, seems to me to be by no means a reasonable conclusion. The new firm was coming into existence on the morning of the first of May, and I. H. B. desired they should be in funds in order to meet any drafts that might be drawn on their agent in New-York. And these funds which he was so receiving were by him designed to be immediately invested in the business of the new firm as a part of its capital. It was, then, perfectly natural, and far more convenient, for I. H. B. to take the drafts and order payable directly to the new firm instead of himself.

2d. This hypothesis is not only reconcilable with all the probabilities of the case, but is *conclusively proved.* (1.) The answer, which is responsive in most of its allegations upon this subject, positively asserts it. (2.) The articles of copartnership show that there was no firm of I. H. Burch & Co. in existence until the 1st of May. By the last provision of that agreement it was to take effect on the 1st of May. Till then it was *inchoate;* and had Thomas Burch, the plaintiff, died before the first of May, all the obligations which he had assumed, including the joint liability for the $5000 notes, being dependant on the contemplated existence of the copartnership on the 1st of May, would have been defeated. I. H. Burch would have been *alone* liable as principal on the notes in question, and on

Burch *v.* Newberry.

the $940,93 note, and he would have been the *sole owner* of the funds in the hands of J. T. Smith & Co., which he had received in payment for his advances for the benefit of the outgoing firm, and also of the draft and order which represented these funds. Indeed he *was* the *sole owner* until the 1st of May, and until then the *future joint ownership* was only a *mere possibility.* (3.) The *notes* which Isaac H. Burch had taken up had been *paid by him,* and were *receipted in full* by the bank officers, and were held by him, with those receipts on them, *merely as evidence* of the fact that he had paid them, and as his *vouchers for* such payment, as against the firm of Newberry & Burch and *not as subsisting securities* against the firm in his own behalf, and far less in the *behalf* of I. H. Burch & Co. These notes had *been paid* by one of the makers who was a *principal,* and not *purchased* by a stranger, or by a *surety.* The banks receipted these notes as *paid,* and did not *endorse* them as *transferred.* (4.) The exhibit, No. 4, is a document in the hand-writing of I. H. Burch, and signed by him in his individual name, by which the firm of Newberry & Burch is *charged* in account with him *individually* with the moneys paid to take up the said notes, and interest, and the $940,93 note, making the sum of $10,961,48; which sum is balanced by a credit of the draft and orders for the funds in the hands of Smith & Co. amounting to precisely the same sum. If the other evidence had left any doubt of the real nature of the transaction, this paper must dissipate it. It is evidence, of the most explicit character, that I. H. Burch was adjusting individually with his partner his claim against the firm for moneys advanced in behalf of it, and that he was receiving in satisfaction of such claim an assignment of the property of the firm in the hands of its agent in New-York, and that the draft and order were the mere instruments to evidence that transfer, and to make it available.

Now, although I entertain no doubt of the correctness of the conclusion I have formed as to the true character of the transaction in question, yet I will not stop to inquire whether the bill should be dismissed upon the ground that the plaintiff has

failed to sustain by proof the case which he has made in the bill itself; because I prefer to place my decision upon the ground of merits alone; in other words, upon the question whether the plaintiff is entitled to any relief upon the case which he has made by the *proofs.*

Before proceeding to a consideration of that question, it may be proper to allude to several matters of fact which have been, to some extent, drawn in question upon the argument. (1.) It must be assumed as an undisputed fact in this cause, that the firm of Newberry & Burch had funds in the hands of Smith & Co. to the full amount called for by the draft and orders of the 30th of April. This fact is distinctly averred in the bill, and admitted in the answer; and it would not be competent, therefore, to disprove it without an amendment of the pleadings. And if it were disproved, it would be evidence of a fact, not within the issue ; which the court would be bound to disregard. But the fact upon which the parties, in their pleadings, have agreed, is *not* disproved. It is true that the witness Underhill says, that by the *books of J. T. Smith & Co.* it did not *appear* that such a balance as was claimed was in the hands of that firm. This witness, however, admits that he did not suppose the books showed the true state of the accounts between the parties. In addition to the belief of this witness, we have most decisive evidence that they *did not ;* for the books did not exhibit any account of the collection paper, nor of its proceeds. (2.) It is one of the grounds of complaint in the bill, and the same position was taken upon the hearing, that J. T. Smith & Co. were only authorized to *sell* the collection paper placed in their hands when it was *necessary* to meet the drafts drawn on them by Newberry & Burch, and that they had sold, without such necessity, and without authority, all but one of the drafts mentioned in the order aforesaid, and had converted the proceeds to their own use. Upon this assumption it is argued that when the order was drawn for the delivery of these collection drafts, or their avails, neither the drafts nor their avails were on hand; so that in fact the order called for property

Burch *v.* Newberry.

supposed by the contracting parties to be in the hands of Smith & Co., but which in truth had no existence.

I am of the opinion that Smith & Co. had authority to sell the drafts in question, and that it can not be successfully maintained that the "*avails*" were not in the hands of Smith & Co. on the 30th of April. (1.) The course of business between the firm of Newberry & Burch and their New-York correspondents gave a large discretion to the latter to make *sales* of these collection drafts. These drafts, drawn upon J. T. Smith & Co. by Newberry & Burch, were payable *at sight*, and were, at times, drawn to the amount of $2000 or $3000 a day, and to provide against emergencies it would be necessary to make collections or sales some days previous to the occurring of actual and known occasions for the use of the funds. Again; it must have been expected by the parties that the firm of Smith & Co. would have the benefit of a considerable deposit, inasmuch as they received no compensation for doing the business, except the use of the deposits, and a greater per cent. on the sale of paper. Again; it is inferable that a general authority was understood by Newberry & Burch, to be extended to Smith & Co. to sell at their discretion; for the reason that in several instances they were directed, by letter, not to sell *either certain specified* paper, *or* at a greater *discount* than 6 *per cent.;* it also appears that they had been directed to sell some of this very paper—and one of the firm of Smith & Co. is a witness, and testifies that in the spring of 1845 I. H. Burch was in New-York, and gave verbal directions "*to sell* any paper of Newberry & Burch's, when *it could be sold at a rea*sonable rate, or *whenever their account required it.* There is therefore no ground for saying that the sales were made without regular authority. (2.) Nor do I think there is any ground for saying that the *avails* of the collection paper were not in the hands of J. T. Smith & Co. on the 30th of April, when the *order* in question was drawn upon that firm. When this firm was *directed*, or *permitted* to sell collection paper, or when they received the proceeds of such paper on collection, it is not to be supposed that they were to make a separate deposit of

the *specific funds* received by them on such sales or collection. On the contrary, the funds were expected to be mingled with their own, and all identity lost. The money proceeds would exist only in the character of a deposit, carried, indeed, in the accounts of the firm of Newberry & Burch, to their credit. Now it is true that the accounts had not been written up accurately, and the entries did not show the receipt of the proceeds of the collection paper, and did not exhibit the true balance that was due to Newberry & Burch. Nevertheless it was *positively sworn* by Mr. Underhill, that the house of Smith & Co. maintained a good credit, and paid all demands on them until the 16th of May, when they stopped payment. He further says that a draft for these proceeds, to their full amount, would have been paid, at sight, on any day prior to the 16th of May ; that the firm had sufficient means and paid all demands upon them up to that day, If that were so, it cannot be denied that the *avails* of these collection drafts were on hand, both in the legal and commercial sense of the term, not in the shape of the *identical proceeds*, but in the shape of a *deposit* which would have been paid at any moment, on a legal demand. I, therefore, think that when Newberry & Burch assigned these drafts or *their avails*, a fund representing the drafts was in the hands of their agents, subject to be transferred by any lawful contract or assignment executed by the parties.

Now upon this state of the facts it seems to me that the plantiff is entitled to no relief, for several conclusive reasons.

I. Deriving his title to relief under the order of the 30th of April, he becomes jointly interested with I. H. Burch in the fruits of *his* purchase of the partnership funds in question, and merely succeeds to an undivided moiety of *his* interest in the enterprise. I have already said that the transaction is to be regarded as an adjustment of a closing partnership concern, by which one partner agrees to pay a certain amount of partnership debts, and to receive a certain amount of partnership funds as an equivalent. In this case, it is true that Burch had *already discharged*, instead of *then assuming*, the stipulated portion of the firm liabilities ; and it is also true that the amount

of partnership effects exceeded the amount of partnership debts assigned or paid, and, as to that balance, the transaction was strictly a purchase; but neither of these circumstances altered the rights or the liabilities of the parties. The agreement was a fair one, without fraud or warranty, and as the partnership fund, thus purchased, was, as we have already seen, then in the hands of the agent of the firm, both parties are bound by this agreement; and the loss of the fund, by the failure of these agents 16 days later, furnishes no ground for relief under the contract. The paper marked exhibit No. 4, is written evidence of the contract, and of the transfer of the fund in question; and the order and draft were merely instruments to make the transfer available; a mere authority to the agents to deliver over the fund to the purchasers.

II. Independently of the ground which I have just considered, it seems to me that there is another and a decisive objection to the relief sought by the plaintiff. On the 30th of April N. & B. gave I. H. B. & Co. the order on Smith & Co. to deliver over the collection paper, or *its avails.* The $3000 draft was transmitted to Smith & Co. by the morning mail of the 1st of May. At a later period of the same day I. H. B. & Co. addressed another communication to Smith & Co. in which, among other things, they request that firm to "*acknowledge the receipt of the paper called for by that order, specifying the items and time of maturity, and to hold them for collection, for our account.*" On the 9th of May Smith & Co. answered the other parts of this communication of I. H. B. & Co. and added, "*we have not time to-day to examine N. & B.'s order for the paper; will refer in our next.*" Now it is not denied that if Smith & Co. had found time to comply with this request of I. H. B. & Co. and had actually acknowledged the receipt of the paper or its avails, and that they held it for the new firm, the loss must have fallen upon the latter. I think it will also be admitted that the ground upon which this loss must have been borne by the new firm, would have been that such an acknowledgment of the receipt of this fund would have either transferred, or have been evidence of a transfer of, the *right of property in*

Burch *v.* Newberry.

*the fund* to that firm; so that the firm would thereby become the owners of that fund, and therefore, to that amount, the creditors of J. T. Smith & Co. when that firm failed. If then it can be established that the right of property in that fund passed to the new firm, notwithstanding the omission of such acknowledgment, the same consequence must inevitably follow. I am of the opinion that it did for the following reasons. (1.) Mr. Chitty defines a bill of exchange to be "an open letter of *request* from, and *order* by, one person on another to pay a sum of money mentioned therein, to a third person. It operates as an *assignment* to a third person of a debt due to the person drawing, from the person upon whom it is drawn." (*Chit. on Bills*, 21. 1 *B. & P.* 291, 664. 1 *H. Bl.* 602.) This doubtless is intended to apply to bills only after their acceptance. As to a *general bill* of exchange, there may still be some doubt of the extent of the application of this principle. In the cause of *Harrison* v. *Williamson*, (2 *Edw. Ch. Rep.* 430,) the late vice chancellor of the first circuit denied that a general bill of exchange would operate as an assignment of the money, for which it is drawn, in the hands of the drawee. But he seems to admit that such would be the effect of a bill drawn upon a *special fund.* In *Peyton* v. *Hallet*, (1 *Caines*, 379,) it was held that after the *presentment* of an order to a person having the funds of the drawer in his hands, such presentment operated as an assignment of the funds, to the extent of the order; and that after such presentment, the drawee could not legally part with such funds to the drawer, or any other person. So when a bill is drawn upon special funds, the authority in the drawee to pay it is not revoked by the death of the drawer before presentment of the bill. (*See Cutts* v. *Perkins*, 12 *Mass. Rep.* 206.; *Debesse* v. *Napier*, 1 *McCord*, 106.) The order now under consideration is not a bill of exchange. It calls for *specific securities* if they have not been converted into money; and in that event, for the *avails* of such securities, without stating the sum. Again; it is not merely an order *on* a special fund, but *for* the special fund, and the whole of it. It is therefore an *assignment* of it; especially after its *presentment.* It should be

borne in mind, also, that when this presentment was made there was *no refusal to accept ;* but as the *peculiar kind of acceptance* called for by the letter of I. H. B. & Co. required time to make an examination in relation to the particulars to be embraced in the acknowledgment of the receipt of the paper or its avails, the house of Smith & Co. merely *deferred* giving the acknowledgement till their next communication.   Instead of a *refusal* to comply with the order, it should be regarded as an acquiescence in its directions, with a postponement of an immediate compliance with them.   This order, therefore, after its presentment, transferred the property in this fund to I. H. Burch & Co. That firm was so completely vested with the title *to,* and the property *in* this fund, that, as to such specific securities as remained undisposed of, an action of trover would have lain, in the name of that firm, against Smith & Co., for a refusal to deliver them.   And if an action for money had and received would not lie, in the name of I. H. Burch & Co. on a refusal to deliver the proceeds of such securities as had been sold, it is not because the property in the fund had not passed, but solely because the subject matter of the assignment was a chose in action, and the absence of an express promise on the part of Smith & Co.   The following cases show how far the courts have gone in entertaining the action for money had and received in cases somewhat analogous to this.   (12 *John.* 276. 14 *East,* 59. 1 *Maule & Sel.* 714. 2 *Camp.* 176.  4 *Id.* 176.   17 *Mass. Rep.* 575.   2 *Denio,* 45.)

It is, however, not material that I. H. B. & Co. should be able to maintain an action for this money, *at law,* in *their own names.*   Their right to the fund was *absolute and perfect.* The firm of N. & B. had no control over it, and Smith & Co. could not divert it, in obedience to their direction, or otherwise, without being responsible to the holders of the order.   The court of chancery affords full and ample protection to the assignee of a chose in action.   I am of the opinion, therefore, that the new firm were the absolute owners of the entire beneficial interest in this fund, and of course must sustain the loss of it.   (2.) Again ; it is to be remembered that the *sole ground*

upon which it is insisted that the loss of the fund in question should fall on the old firm, is because J. T. Smith & Co. did not, on the receipt of the order, either give an acknowledgment that they held it for the new firm, or pass the amount of it to the credit of that firm on their books. These acts, however, merely amount to a *recognition by, and an evidence against,* Smith & Co., as between that house and the new firm, of the rights of the latter, and could not *create* any new or greater rights to the property of the fund than had already been acquired by the order which assigned it. Nevertheless it was the duty of Smith & Co., as the agents of the old firm, to obey its orders, and as the agents of the new firm, to comply with its directions. It was virtually agreed to be done; it was directed to be done by the parties having the authority to give such directions, and it was clearly the duty of the agent to perform the act so directed to be done. Now it is a general maxim of the court of chancery, that equity regards whatever is ordered to be done by one having authority, as by a testator in his will, or what ought to be done, as *actually done.* (*See* 1 *Story's Eq. Jur.* 79, § 61.) Mr. Story says, in this section, that "the true meaning of this maxim is that equity will treat the subject matter, as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties *had been executed exactly as they ought to have been.*" Again, on page 80, he says, "The most common cases of the application of the rule are under agreements. All agreements are *considered as performed,* in favor of persons entitled to insist upon their performance: they are to be considered as *done at the time* when, *according to the terms thereof,* they ought to have been performed." The author then speaks of the consequences flowing from the application of this principle, which are, that the rights and liabilities of the parties are to be determined as though the act had actually been performed in due time; so that neither party shall derive any benefit, or sustain any loss by reason of any laches or neglect. In my judgment, the case under consideration is a proper one for the application of this maxim, although I am

Burch v. Newberry.

not aware of any adjudication sustaining its application to a case precisely like this. The omission to pass the proceeds of this collection paper to the credit of the new firm, and to give a written acknowledgment of holding the fund for such firm, was the neglect of a *common agent* of *both firms.* As the agent of the old firm, the house of Smith & Co. was bound to *deliver the collection paper, or its avails, to I. H. B. & Co.* And had a person properly authorized by that firm, made a demand that the said paper, or its avails, should *actually be delivered over,* the omission to comply with such demand would have been chargeable upon N. & B. as the act of *their agent ;* but when, instead of such demand, made by a person prepared *to receive* the said paper or its avails, I. H. B. & Co. send the orders to Smith & Co. with directions to receive the fund in question by transferring it on their books, and by giving a written acknowledgment of its receipt, it will be seen that the act of making the *demand, receiving the fund,* and *acknowledging the receipt,* were all to be performed in the *behalf* and *as the agents of I. H. B. & Co.* J. T. Smith & Co., therefore, being requested to deliver and receive the fund themselves, for the new firm, are to be regarded as having performed that duty, inasmuch as they *had the money in their possession.* Having it in their possession then, upon the receipt of the order, and of the letter of I. H. B. & Co., *they were thenceforward the holders of the fund,* as the agents of that firm ; and the omission to place it formally to the credit of the new firm, and to acknowledge the holding of it for that firm, was the neglect of an act to be done as the agent solely of I. H. Burch & Co. By the omission of that act, therefore, N. & B. should not be prejudiced.

III. Again ; upon the most favorable view of this case for the plaintiff, the loss must fall upon him if he has been wanting in due diligence in making the proper presentment and demand of the order of the 30th of April ; and if the defendant has sustained damages by such neglect.

There is no evidence in the case showing that the defendant Newberry in any manner directed, or assented to the manner in which I. H. B. & Co. chose to make presentment and de-

mand of the order upon the house of J. T. Smith & Co. It was for the payee of that order to use reasonable diligence in presenting and demanding payment of the drawees. Now, independently of the rules which have been established in relation to the diligence required of the holders of commercial paper, it seems to me that there can be but one opinion as to the conduct of the holders in this case. It seems to be a very clear proposition that a demand of payment made by John T. Smith & Co. of themselves is no demand at all. A demand should have been made by some third person authorized to *receive* the *actual possession of the fund.* The drawers of the order have a right to insist upon such a demand as, if complied with, would divest the drawees of the possession of the fund, and thus discharge them of their responsibility for any subsequent loss. The firm of N. & B. ordered the house of Smith & Co. to *deliver to I. H. B. & Co. the paper, or its avails.* Upon this order Smith & Co. were legally bound to make a *delivery* of this paper, or its avails, to *the new firm, or its authorized agent,* on due presentment and demand ; but they were under no obligations to do any thing else. They were not bound to open a new account with I. H. B. & Co., to pass this fund to their credit, and to give a receipt acknowledging the holding of the fund on the behalf of their new correspondents. They might be very willing to contract with the new firm to perform these duties ; but they owed no such obligations to the firm of N. & B., nor did the order of N. & B. require of them the performance of any such act. There was, therefore, no such demand as the law contemplates when it holds a party to the use of a reasonable measure of diligence. I entertain but little doubt that had the proper and usual demand been made, the loss that has occasioned this litigation would have been avoided. Had a stranger presented this order for the delivery of the collection paper, or its avails, it is said by the witness Underhill that he should have taken time to examine the account of N. & B., and if that account had been found good, the avails of the paper would have been paid over at any time before the 16th of May. Now the fact that these agents *did not in fact*

*examine that account,* and make the *requisite returns to Chicago* before the 16th of May, affords no sufficient evidence that this examination would not have been made immediately on the demand, if the presentment and demand had been made *personally,* by an authorized agent in the city of New-York. In that event there is every reason to believe that the requisite examination would have been made immediately, and the money paid on the spot; or at least, that the examination would have been made on that day, and an appointment made with the agent presenting the order, for the payment of the balance found due, on the next day. A greater delay than this would have been incompatible with the prompt habits of commercial men in good credit in the city of New-York. The testimony of the witness Underhill is positive that the avails of the paper in question would have been promptly paid at any time prior to the 16th of May, and is entirely incompatible with the idea that there would have been any delay in making such examination with the view of avoiding the necessity of paying over the amount found due.

In answer to this argument it may be urged, that neither Newberry nor I. H. Burch had any reason to suspect the solvency of the house of John T. Smith & Co., and that I. H. Burch & Co. chose to allow the money to remain in their hands as a deposit against which to draw in the prosecution of their business as exchange brokers. This doubtless was the true reason why this fund was not withdrawn from the possession of J. T. Smith & Co. as it would have been under other circumstances. That, however, furnishes no reason for devolving this loss upon the defendant. If the firm of I. H. B. and Co., when they received this order, intended to hold the drawers responsible upon it for the insolvency of the drawees, then they should have pursued the usual course for removing the fund from the possession of the latter; and if there be good reasons to believe that the usual and ordinary demand, by a third person, would have resulted in a payment prior to the 16th of May, then the defendant should be discharged. There is also an additional ground for holding the new firm to this reasonable

Burch *v.* Newberry.

measure of diligence, because it is more than probable that had it not been for the agreement which resulted in the giving of this order to the new firm, the defendant, upon the closing of his business as a broker, and having no farther use for this fund in the hands of his former agents, would have withdrawn it on the 1st of May.

The bill must be dismissed, with costs.